**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Leonard R. Woods,<br>Petitioner<br>v.<br>Debora Borgas,[1] et al.,<br>Respondents | Case No.: 2:23-cv-00233-JAD-MDC<br>**Order Denying Amended Petition for Writ of Habeas Corpus**<br>[ECF No. 17] |

Counseled petitioner Leonard R. Woods brings this federal habeas action to challenge his 2019 Nevada state-court convictions for the murder of his girlfriend, crimes against her teenage daughter, and possession of firearms by an ex-felon. I previously dismissed[2] Woods's Fourth Amendment claim for failure to suppress evidence under the United States Supreme Court's opinion in *Stone v. Powell*.[3] The parties have now fully briefed the merits of Woods's remaining claims.[4] Having carefully examined that briefing and the record, I find that Woods is not entitled to federal habeas relief, so I deny his petition, deny a certificate of appealability, and close this case.

## Background

On July 17, 2015, police officers responded to a report of child molestation and made contact with the victim, 15-year-old D.L., and her mother, Josie Jones.[5] D.L. said that her

[1] Debora Borgas is substituted for Terry Royal as the respondent warden under Fed. R. Civ. P. 25(d).

[2] ECF No. 50.

[3] *Stone v. Powell*, 428 U.S. 465 (1976).

[4] ECF Nos. 17 (amended petition), 57 (answer), 60 (Woods's reply), 67 (respondents' surreply).

[5] ECF No. 34-16 at 6.

mother's boyfriend Leonard Woods had inappropriately touched her.[6] The police arrested Woods but soon released him.[7] On August 5, 2015, Josie was fatally stabbed in a drugstore parking lot while D.L. screamed for help.[8] D.L. and two other witnesses identified Woods as the attacker.[9]

In May 2019, following a bifurcated jury trial in Nevada's Eighth Judicial District Court for Clark County at which Woods represented himself,[10] Woods was convicted of murder with use of a deadly weapon; two counts of capturing an image of the private area of another person; open or gross lewdness; and two counts of ownership or possession of a firearm by an ex-felon.[11] Woods was sentenced to life without the possibility of parole for the murder, plus a consecutive 96 to 240 months in prison for the deadly weapon enhancement. For the other crimes, he was sentenced to additional prison time to be served concurrent with his life sentence.[12]

The Nevada Supreme Court affirmed the judgment of conviction on November 3, 2020, and denied rehearing and en banc reconsideration.[13] Woods then filed a pro se state postconviction habeas petition, which the state district court denied.[14] Woods appealed, and the Nevada Supreme Court affirmed on August 11, 2022.[15]

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at 7.

[10] ECF Nos. 32-6, 32-10, 32-11, 32-12, 32-13, 32-17.

[11] ECF No. 33-1.

[12] *Id.*

[13] ECF Nos. 34-2, 34-4, 34-6.

[14] ECF Nos. 34-10, 34-15.

[15] ECF No. 34-25.

This Court received Woods's pro se federal petition for writ of habeas corpus on February 14, 2023.[16] On Woods's motion, I appointed the Federal Public Defender for the District of Nevada as his counsel.[17] Woods's counsel filed an amended habeas petition on his behalf on September 6, 2023.[18] That amended petition—Woods's operative one here—includes the following claims:

> Ground One: Woods's trial counsel made racist comments resulting in a breakdown in the attorney-client relationship, violating his rights to counsel, fair trial, and equal protection under the Fifth, Sixth, and Fourteenth Amendments.
>
> Ground Two: The trial court violated Woods's Sixth and Fourteenth Amendment right to counsel by denying his repeated requests for substitution of counsel.
>
> Ground Three: The trial court violated Woods's right to self-representation and due process under the Sixth and Fourteenth Amendments by denying his right to personally voir dire prospective jurors.
>
> Ground Four: Woods's rights to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecution committed misconduct by:
>
> A. Undermining Woods's presumption of innocence;
>
> B. Improperly using leading questions; and
>
> C. Misleading the jury with facts not in evidence.
>
> Ground Five: Woods's right to due process under the Fifth and Fourteenth Amendments was violated when the court failed to suppress the contents of his cellphone.
>
> Ground Six: Woods's right to a fair trial under the Sixth and Fourteenth Amendments was violated when the court failed to instruct the jury on an essential element of the weapons charges.

---

[16] ECF Nos. 1, 4.

[17] ECF No. 3.

[18] ECF No. 17.

Ground Seven: The cumulative effect of the errors raised in Woods's petition violated his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments.

In March 2024, the respondents moved to dismiss grounds one, five, and seven, arguing that grounds one and seven are unexhausted or procedurally defaulted; that ground seven is not cognizable on federal habeas review; and that ground five is barred by *Stone v. Powell*.[19] I granted the motion to dismiss in part and dismissed ground five under *Stone* because the trial court gave Woods a full and fair opportunity to litigate his suppression claims.[20] I deferred consideration of the respondents' procedural-default claims on grounds one and seven until a merits determination, and I rejected the respondents' oft-repeated contention that Woods's ground-seven cumulative-error claim is not cognizable in habeas.[21]

## Discussion

### A. Legal standard for claims adjudicated on their merits in state court

Federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act, also known as "AEDPA." If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[22] A state court's ruling is contrary to clearly established federal law if it applies a rule contradicting the relevant Supreme Court

[19] ECF No. 28.

[20] ECF No. 50.

[21] *Id.*

[22] 28 U.S.C. § 2254(d).

holdings or reaches a different conclusion on materially indistinguishable facts.[23] And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[24] Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[25] The "objectively unreasonable" standard is difficult to satisfy;[26] "even 'clear error' will not suffice."[27]

The AEDPA bar is high,[28] and federal habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[29] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[30] "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[31]

---

[23] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[24] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[25] *Id*. (emphasis added).

[26] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[27] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[28] As the United States Supreme Court acknowledged in *Harrington v. Richter*, 562 U.S. 86, 102 (2011), "If this standard is difficult to meet, that is because it was meant to be."

[29] *Harrington*, 562 U.S. at 102.

[30] *Id*. at 103.

[31] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

If a federal district court finds that the state court committed an error under § 2254(d), the district court must then review the claim de novo,[32] and the petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.[33] State court factual findings are presumed correct unless rebutted by clear and convincing evidence.[34]

**B. Legal standards concerning technical exhaustion and procedural default**

Because a habeas petitioner must give the state courts a fair opportunity to act on each of his claims before he presents them in a federal habeas petition, the federal court will not consider a state prisoner's petition for habeas relief until he has properly exhausted his available state remedies for all claims raised.[35] A claim remains unexhausted until the petitioner has given the highest available state court the opportunity to consider the claim through direct appeal or state collateral-review proceedings.[36] To properly exhaust state remedies on each claim, the habeas petitioner must "present the state courts with the same claim he urges upon the federal court."[37]

Under certain circumstances, a petitioner may argue that a claim that was not presented in state court is technically exhausted "if state procedural rules would now bar the petitioner from bringing the claim in state court."[38] To show technical exhaustion by procedural default, the

---

[32] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[33] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[34] 28 U.S.C. § 2254(e)(1).

[35] *Rose v. Lundy*, 455 U.S. 509 (1982); 28 U.S.C. § 2254(b).

[36] *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999); *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

[37] *Picard v. Connor*, 404 U.S. 270, 276 (1971).

[38] *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991)).

record must reflect that "it is clear that the state court would hold the claim procedurally barred."[39] If that claim would have been procedurally defaulted, a petitioner may argue that his default should be excused under the cause-and-prejudice standard articulated by the Supreme Court in *Coleman v. Thompson*.[40] To demonstrate cause for a procedural default, the petitioner must be able to "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.[41] That external impediment must have prevented the petitioner from raising the claim.[42] And to show prejudice, the petitioner must demonstrate "not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension."[43]

In most cases, this court has been unreceptive to claims of technical exhaustion by procedural default if the petitioner also claims he could establish cause and prejudice or actual innocence to excuse that default. On one hand, if a petitioner has an argument for cause and prejudice or actual innocence under the substantially similar state and federal standards, then he could not establish that "it is clear that the state court would hold the claim procedurally barred,"[44] and the ground would not be technically exhausted. On the other hand, if a petitioner had no arguments for cause and prejudice or actual innocence, then the ground would be

---

[39] *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002).

[40] *Coleman*, 501 U.S. at 750. Woods does not argue that the "failure to consider [his] claims will result in a fundamental miscarriage of justice," *id.*, so I do not address this alternate standard for excusing default that was also identified in *Coleman*.

[41] *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (emphasis added).

[42] *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

[43] *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

[44] *Sandgathe*, 314 F.3d at 376.

technically exhausted but also subject to dismissal as procedurally defaulted. But, when federal law recognizes a potential basis to excuse a procedural default and the Nevada state courts do not, then the petitioner can argue in federal court both that a ground is technically exhausted and that an excuse for the procedural default exists.

Ineffective-assistance-of-trial-counsel (IAC) claims are one area in which this dichotomy exists. The United States Supreme Court held in *Martinez v. Ryan* that ineffective assistance of state postconviction counsel (or the lack of counsel in state postconviction proceedings) could excuse a procedurally defaulted IAC claim under certain conditions.[45] But the Nevada Supreme Court has declined to follow the *Martinez* Court's approach.[46] So a Nevada habeas petitioner who can rely on *Martinez*—and only *Martinez*—as a basis for overcoming a state procedural bar on an unexhausted claim can argue that the state courts would hold the claim procedurally barred but that he nonetheless has a potentially viable argument for cause and prejudice under federal law.

**C. Legal standards governing IAC claims**

The right to counsel embodied in the Sixth Amendment guarantees "the right to the effective assistance of counsel."[47] In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that to prevail on an IAC claim, a petitioner must show that

---

[45] *Martinez v. Ryan*, 566 U.S. 1 (2012). For this to happen, the petitioner must demonstrate that (1) the claim of ineffective assistance of trial counsel is substantial; (2) ineffective assistance of post-conviction counsel (or lack of counsel) is the cause of the default; (3) the post-conviction proceedings were the initial review proceedings for the ineffective-assistance-of-trial-counsel claim; and (4) state law requires, or practically requires, that the claim be raised in the initial post-conviction proceedings. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013).

[46] *Brown v. McDaniel*, 331 P.3d 867 (Nev. 2014).

[47] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

(1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[48] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceedings would have been different.[49] A reasonable probability is a "probability sufficient to undermine confidence in the outcome."[50] The likelihood of a different result must be substantial, not just conceivable.[51]

Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[52] A petitioner making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[53] The test is whether the attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom.[54] A petitioner must overcome the presumption that counsel made sound trial-strategy decisions.[55] It is inappropriate to focus on what could have been done rather than focusing on the reasonableness of counsel's performance.[56]

---

[48] *Id*. at 690.

[49] *Id*. at 694.

[50] *Williams v. Taylor*, 529 U.S. 390–91 (2000) (quoting *Strickland*, 466 U.S. at 694).

[51] *Pinholster*, 563 U.S. at 189 (citing *Harrington*, 562 U.S. at 112).

[52] *Strickland*, 466 U.S. at 689.

[53] *Id*. at 690.

[54] *Harrington*, 562 U.S. at 105.

[55] *Id*. at 104–05.

[56] *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687–94).

**D. Woods's right-to-counsel claims (grounds one and two) do not entitle him to habeas relief.**

In ground one, Woods claims that Julia Murray, one of the public defenders appointed for him by the trial court made racist comments resulting in a breakdown in the attorney-client relationship, violating his rights to counsel, a fair trial, and equal protection under the Fifth, Sixth, and Fourteenth Amendments.[57] In ground two, Woods claims that the trial court violated his Sixth and Fourteenth Amendment right to counsel by denying his repeated requests to substitute Murray with alternative representation before trial.[58]

***1. Before trial, the court held several hearings concerning conflicts between Woods and his counsel.***

At a pre-trial hearing on December 17, 2015, Murray told the presiding judge Michelle Leavitt that Woods had on multiple occasions expressed an interest in having her removed from his case.[59] Murray said that she thought Woods should be able to voice his concerns to the court, perhaps in a *Young* hearing.[60] Judge Leavitt asked Woods to explain, and Woods described the comment Murray had made to him:

> Your Honor, from the beginning . . . we didn't get along. There was statements made. This wasn't because I just didn't want to hear it. I was hearing statements from my public defender. Like when she first came to me she was like telling me, you know, I'm not just some white girl that doesn't know the streets. And I'm like where's that coming from? [61]

[57] ECF No. 17 at 6–11.

[58] *Id*. at 11–18.

[59] ECF No. 29-11 at 6.

[60] *Id*. at 7 (referring to *Young v. State*, 102 P.3d 572 (Nev. 2004), in which the Nevada Supreme Court established the procedure for Nevada courts to address criminal defendants' requests for substitution of counsel).

[61] *Id*. at 11–12.

Woods said, “I felt like that was a borderline racial statement, you know.”[62] He explained, “I hadn’t even said a word out of my mouth and you come at me like that and feel like that was even appropriate or necessary.”[63] He then went on to complain to the judge that he felt his attorneys were not sufficiently investigating his case.[64] Murray explained that she had a team—herself, another attorney, an investigator, and two mitigation specialists—working on the case and communicating with Woods about it.[65] Murray and the Court then had this exchange:

> THE COURT: Is most of it he doesn’t like what you’re saying?
>
> MS. MURRAY: I think that there’s some deep rooted, you know, thought issues here regarding his interests in having a white female attorney. I mean, I think that that is some of it. I think he’s got –
>
> THE COURT: What do you mean? He doesn’t want --
>
> MS. MURRAY: -- some upset issues –
>
> THE COURT: -- a white female attorney?
>
> MS. MURRAY: I think that that has something to do with it.
>
> THE COURT: After he just called you a racist.
>
> MS. MURRAY: I know.
>
> THE DEFENDANT: Why -- why would --
>
> MS. MURRAY: I think that has something to do with it. I think that there’s also just a natural -- a natural issue that unfolds when you have charges like this where your emotions are high --[66]
>
> THE COURT: Yeah. You’re -- I get that.

---

[62] *Id*. at 12.

[63] *Id*.

[64] *Id*. at 13–15.

[65] *Id*. at 15–16, 18.

[66] *See* ECF No. 17 at 17 (“Woods is an African American man who was accused and ultimately convicted of murdering his girlfriend Josie, a white woman.”).

> MS. MURRAY: -- and it takes a long time to adjust and get used to a person. I think he's very scared. He understands the severity of what he's looking at and he needs to get himself to a place where he's comfortable.
>
> We did have a conversation where I said I'm not a white girl that doesn't understand the streets. It was in relation to my ability to investigate his case. He said none of these people are going to speak to you anyhow. I said they will. I've done this before. I've been in many different environments. I've lived in all these different places. I get why that might be your initial impression of me, but you don't know much about me or my background. We did have a conversation of that nature. It was never intended to be an insulting statement or --
>
> THE COURT: Of course not.
>
> MS. MURRAY: -- or anything else. I appreciate the -- you know, the difficulty he's looking at right now and the fact that he's -- he has these thoughts and feelings. And I felt like it's been brought up so many times that it made sense that it come to the Court because I know that he needs to have this stuff out there so that perhaps it can get put behind and we can keep working.
>
> THE COURT: Okay.[67]

About six months later, Woods filed a motion to dismiss Murray as his counsel and appoint alternate counsel.[68] In that motion, he complained primarily about Murray's "refusal or failure" to investigate his case thoroughly and to discuss with him his feelings about "being forced into waiving his preliminary hearing."[69] He stated that his relationship with Murray had "deteriorated beyond repair" and that Murray was not investigating his "alibi(s) and evidence in [his] favor," was not subpoenaing phone records, was not providing him with discovery, and had

---

[67] *Id*. at 16–18.

[68] ECF No. 29-19.

[69] *Id*. at 3.

told him to waive his preliminary hearing.[70] Woods stated that "[a]fter trying to fire my public defender through the Nevada Bar Association (11/20/15) she retaliated by falsely stating to Judge Michelle Leavitt that she 'thinks I don't want a white woman defending me' which was untrue, unfair, unprofessional, and racist."[71]

Judge Leavitt held a hearing regarding the motion on July 21, 2016.[72] Woods reiterated that he felt his attorney-client relationship with Murray had broken down, and he repeated his claim that she was not adequately investigating his alibis.[73] Woods expressed his belief that Murray's statement to the court on December 17, 2015—that she believed Woods did not want to be represented by a white woman—prejudiced the court against him.[74] Judge Leavitt responded that she was not prejudiced against him, told Woods that he had "two extremely effective and competent lawyers here," and stated that she did not see any basis to dismiss Murray.[75] Woods raised the possibility that he may wish to represent himself rather than have Murray as his counsel.[76] The judge said that if Woods wanted to represent himself she would conduct a *Faretta* canvass.[77] Murray requested that the *Faretta* canvass be scheduled for a later date so she would have time to discuss it with Woods.[78] At the hearing the following week,

---

[70] *Id*. at 4.

[71] *Id*.

[72] ECF No. 29-20.

[73] *Id*. at 5–6.

[74] *Id*. at 6–8 ("Okay. I mean, that did not affect you and me or anything that has to do with your case. I don't even care about that. I'm beyond that.").

[75] *Id*. at 6–8, 14–15.

[76] *Id*. at 13.

[77] ECF No. 29-20 at 16 (referencing *Faretta v. California*, 422 U.S. 806 (1975)).

[78] *Id*. at 16–18.

Woods informed the judge that after speaking with his attorneys he decided that, while he still wished to be represented by other counsel, he did not want to proceed on his own and he did not want to go forward with the *Faretta* canvass.[79]

About four months later, on November 21, 2016, Woods filed another motion to dismiss Murray as his counsel and appoint alternate counsel.[80] Again, Woods complained primarily about Murray's performance, complaining that she was not sufficiently investigating his case or making necessary motions, she failed to challenge the sufficiency of the information, she improperly advised him to waive a preliminary hearing, she did not properly handle a suppression hearing, she failed to object to a warrant search, and she "failed to investigate a motive for false accusations."[81] Referring to the December 17, 2015, hearing, Woods claimed that Murray "used a racially slanderous statement toward [him] in front of judge," and he reiterated his belief that Murray did so in retaliation for his attempt "to remove [her] through the Nevada Bar Association (11-20-15)."[82]

Judge Leavitt held a hearing on December 13, 2016, and denied the motion.[83] Woods then said he would request to represent himself "if that's what [he had] to do to get rid of them," so the judge set a *Faretta* hearing for the following week.[84] At that hearing, however, Woods told Judge Leavitt that "[t]here might not be any need for . . . for the *Faretta,*" and "my whole

---

[79] ECF No. 29-21.

[80] ECF No. 29-22.

[81] *Id*. at 3–4.

[82] *Id*. at 4–6; *see also* ECF No. 29-23 (reflecting that Woods filed a Petition for Writ of Mandamus the same day, requesting that Murray be removed as his counsel and asserting essentially the same complaints about her).

[83] ECF No. 29-24.

[84] *Id*.

thing is I'm just overly concerned [that] so little is being done for such serious charges. You know I didn't kill anybody."[85] Woods said he did not want to represent himself, but again raised the same complaint that his counsel were not sufficiently preparing his case for trial.[86] Murray informed the judge that the defense team was working diligently.[87] Woods did not mention his claims that Murray made racist statements.

Some ten months later, Woods filed a third motion to dismiss Murray, reiterating his same complaints about her.[88] The court held another hearing, this time with Judge Douglas W. Herndon presiding.[89] Woods voiced the same complaints, and Murray responded, explaining the work that she and the defense team were doing.[90] Woods said that "race had never been a topic" in his discussions with Murray before the December 17, 2015, hearing.[91] Murray admitted that she had told Judge Levitt that she "did not believe [Woods] wanted a white woman representing him," explaining that she had several conversations with Woods at the onset of her representation in which Woods questioned her ability to "handle this particular case," not because of her experience or training, but because he was worried that "the witnesses that he believed needed to be spoken to would [not] speak with me . . . for reasons that relate to my being a white woman."[92] Murray stated that she did not believe that she had a conflict in this case, but she represented that her relationship with Woods was extremely difficult from the

---

[85] ECF No. 29-25 at 3–4.

[86] *Id*. at 5–11.

[87] *Id*. at 13–15.

[88] ECF No. 29-30.

[89] ECF No. 30-2.

[90] *Id*. at 3–24, 29–32, 35–37.

[91] *Id*. at 4.

[92] *Id*. at 26.

beginning and that Woods was "so distrustful of [her] and the team," and she admitted that "there is a breakdown and [she didn't] know how to fix it."[93]

Judge Herndon then asked Woods what it was "from so long ago that caused you to . . . have this issue with your attorneys?"[94] Woods explained that it began when "she stood up in court and said [he] didn't want a white woman defending [him]."[95] He disclaimed his initial complaint that he and Murray had a "racist discussion" and he didn't "know why she keeps telling [the judge] that."[96] Woods admitted that he had a discussion with Murray in which he expressed concern about her ability to get witnesses to talk to her, but he focused on the fact that Murray hadn't reached out to the people Woods believed were important witnesses.[97] He reiterated that he didn't trust Murray and he didn't believe he was going to get a fair defense.[98] Judge Herndon asked if Woods could continue to work with Murray and the defense team, and Woods responded "of course," but expressed his concern about "future problems" that would be overlooked again.[99]

Judge Herndon declined to remove Murray as counsel:

> THE COURT: . . . It would also not be the first time that a comment has been made, not by Ms. Murray, but other people, of that same kind of ilk, in terms of somebody not wanting somebody to represent them because of a certain thing about them, whether it's solely because they're a woman or solely because they're a man or solely because they're white, black, Hispanic, whatever it is.

---

[93] *Id.* at 28.

[94] *Id.* at 38.

[95] *Id.*

[96] *Id.*

[97] *Id.* at 38–39.

[98] *Id.* at 39.

[99] *Id.* at 42.

If there's a belief that a defendant has some idea, and you admitted a moment ago that you did tell her that you thought that she was going to be unable to talk to certain witnesses, if an attorney has an idea that a defendant feels that way about a certain thing, they're going to articulate that to the Court. It doesn't mean it's a racist comment, doesn't mean it's racially disrespectful to you. It's just she perceived that you thought that she wasn't going to be able to get information from witnesses that you wanted her to get information from because she was a white woman and may be other people --

THE DEFENDANT: I never said that.

THE COURT: -- wouldn't talk to her because of that.

THE DEFENDANT: I never said that.

THE COURT: If she was incorrect about what you were communicating, since you admitted that you communicated that you didn't think she was going to be able to get the information, if she was wrong about why she thought you perceived that, that's okay, it happens. But it doesn't make her a racist. It doesn't prejudice Judge Leavitt against you. It sure doesn't prejudice me against you about anything related to that. So I'm not worried about that at all either.

I am worried about obviously getting your case to trial. If there is some reason to sever the charges, and I've got a feeling that motion will get filed at an appropriate time, if they believe there's a basis to sever those charges, then we'll deal with that. A lot happens within the last 60 days before a trial starts. If we know the trials going to go, that's when a lot of motions start getting filed and scheduled for hearing to start shaping how the trials going to occur.

It can be hard. You've got to be really patient, I know. Because you're thinking, what the hell, we've been sitting here forever and these things haven't been done. A lot happens. But a lot doesn't happen if they think the trial's not going to go. Because it doesn't behoove them to display a lot of things that they're thinking about by motion practice, if that trial isn't going to go; okay.

So at this point in time I'm not going to remove them as counsel. You obviously continue to have that ability to raise issues with me. And I will ask, since our trial date's going to remain for right now,

> and it's a couple of months away, that we're starting to get on a schedule of scheduling visits. I'm not saying it has to be you-all, whether it's mitigation experts or investigators.
>
> MS. MURRAY: I understand that.
>
> THE COURT: Accept the visits; all right. They want you to partake in your defense, trust me.
>
> THE DEFENDANT: It was one time two years ago.
>
> THE COURT: Well, and that's going --
>
> THE DEFENDANT: Well –
>
> THE COURT: -- that's going to change.
>
> THE DEFENDANT: -- Am I gonna stay in your court?
>
> THE COURT: We're going to get a lot of people over there to visit you as we're getting ready for trial; okay.
>
> THE DEFENDANT: Am I gonna stay in your courtroom?
>
> THE COURT: Yep.
>
> THE DEFENDANT: Okay.
>
> THE COURT: Your case is assigned to me.
>
> THE DEFENDANT: That's cool.
>
> THE COURT: All right.[100]

Nine months later, Woods filed a motion to proceed pro se.[101] He complained that "counsel has made no reasonable effort to exercise compulsory processes, nor file any counter-

---

[100] *Id*. at 45–47.

[101] ECF No. 30-14.

claim, or negative averments."[102] He did not mention any alleged racist statements made by Murray, or any alleged racism on her part.

On August 29, 2018, Judge Herndon held a hearing on the motion and canvassed Woods regarding his request to proceed pro se.[103] Woods made no mention of any alleged racist comment made by Murray, or any alleged racism on her part. On the contrary, Woods said:

> . . . I want, for the record, I want to state the fact that even though me and Ms. Murray started off shaky, the last time you told me to talk to see if you guys can work it out. We talked in -- it's -- it's more professional. 'Cause on a personal level I'm okay, we're okay, you know . . . I consider her -- excuse me -- my friend on the outside now that we've got to know each other. We've shared some stories. . . . And, you know, so it's not about I don't like her. . . . You know, maybe it was kind of like that at first. . . . I'm hoping she feel the same way. But we good. [104]

Woods, however, stood on his request to be allowed to proceed pro se, and the Court granted it.[105] Woods asked that he be given standby counsel, and Judge Herndon left the public defender in place in that capacity.[106]

***2. Ground one is insubstantial and procedurally defaulted.***

In ground one, Woods claims that Murray made racist comments resulting in a breakdown in the attorney-client relationship, violating his rights to counsel, fair trial, and equal protection under the Fifth, Sixth, and Fourteenth Amendments.[107] In the order resolving the respondents' motion to dismiss, I ruled that ground one is technically exhausted because it would

---

[102] *Id*. at 3.

[103] ECF No. 30-15.

[104] *Id*. at 38.

[105] *Id*. at 40.

[106] *Id*. at 7, 39–40.

[107] ECF No. 17 at 6–11.

now be procedurally barred in state court, but I deferred until the merits briefing the issue whether Woods can overcome the procedural default under *Martinez*.[108]

Under *Strickland*, Woods must show that Murray's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for her error, the result of the proceedings would have been different. In his amended petition, Woods focuses solely on the allegation that Murray was ineffective because of her statements regarding race, contending that Murray "was treating Woods differently because of his skin color and did not act with appropriate loyalty toward him."[109] Woods does not satisfy either prong of the *Strickland* test.

Murray did not perform unreasonably. The comment that Woods claims gave rise to the difficulties between them—"I'm not just some white girl [who] doesn't know the streets"— was a reference to race only in that she mentioned her own racial background. Murray was plainly attempting to convey that she could handle Woods's case in response to his concerns that witnesses may not be willing to talk to her. Murray did not make any overtly disparaging comments about Woods or express any animosity or antagonism toward him because of his race. While her comment may have been unwarranted because Woods wasn't considering her race when expressing concerns about her investigating his case, nothing about her statements was so objectively unreasonable that it amounts to deficient performance.

Similarly, Murray's statement to Judge Leavitt suggesting that Woods might not want a white woman as his counsel was apparently her honest view of what might have been part of the cause of the difficulties between Woods and herself. It was not unreasonable for her to share that suspicion with the judge in an effort to contextualize the issues that had arisen between herself

[108] ECF No. 50 at 4–8.

[109] ECF No. 17 at 10.

and Woods. At no point is it inferable from the record that Murray or Judge Leavitt—who, as Woods points out in his petition, is also a white woman—treated Woods any differently because of Murray's statements.

Woods relies on the Ninth Circuit's findings in *Frazer v. United States*[110] to suggest that Murray's comments were deficient. In *Frazer,* the defendant's attorney called him a "stupid nigger son of a bitch," told the defendant that he hoped he "gets life," and threatened to provide substandard performance if the defendant chose to exercise his right to go to trial.[111] The Ninth Circuit held that such behavior was deficient, noting that the attorney's aggressively racist conduct "completely destroys and negates the channels of open communication needed for the relationship to function as contemplated in the Constitution."[112] The court also observed that "[i]t could not be said in the light of such a proved outburst that counsel was acting 'in the role of an advocate.'"[113]

But Murray's comments were nowhere near as egregious as those made by the attorney in *Frazer.* Murray did not express disdain or lack of loyalty because of Woods's race, nor did she make her performance contingent on Woods's decision to go to trial. Her comments also did not destroy the communication between herself and Woods, as shown by Woods's admission at his final *Faretta* hearing that the two had patched up their relationship before trial.[114] So I cannot

---

[110] *Frazer v. United States*, 18 F.3d 778 (9th Cir. 1998), *overruled on other grounds by Ellis v. Harrison*, 891 F.3d 1160 (9th Cir. 2018).

[111] *Id.* 780–81.

[112] *Id.* at 785.

[113] *Id.*

[114] *See* ECF No. 30-15 at 38.

conclude that this case is similar enough to *Frazer* to find that Murray's comments were deficient.

Woods suggests that Murray's comments prejudiced him by ultimately leaving him no choice but to represent himself at trial. But the record reflects that Murray's comments had nothing to do with Woods's motion to proceed pro se. Murray's comments weren't mentioned in that motion and, at the related hearing, Woods told Judge Herndon that his initial difficulties with Murray had been resolved.[115] So Woods fails to meet either of the prongs of the *Strickland* test: she did not perform unreasonably as alleged by Woods, and there is no showing that, had she performed differently, there is a reasonable probability that the outcome of Woods's case would have been different. His claim in ground one is thus procedurally defaulted, and Woods does not overcome the procedural default under *Martinez*.

***3. The Nevada Supreme Court's denial of relief on ground two was not objectively unreasonable under 28 U.S.C. § 2254(d).***

In ground two, Woods claims that the trial court violated his Sixth and Fourteenth Amendment right to counsel by denying his repeated requests for substitution of counsel.[116] The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at all critical stages of the proceedings.[117] It ensures defendants "an effective advocate," but does not guarantee that the defendant "will inexorably be represented by the lawyer whom he prefers."[118]

---

[115] *Id*.

[116] ECF No. 17 at 11–18.

[117] *Coleman v. Alabama*, 399 U.S. 1, 7 (1970).

[118] *Wheat v. United States*, 486 U.S. 153, 159 (1988).

Woods asserted this claim on direct appeal.[119] The Nevada Supreme Court denied relief, finding that Woods didn't show good cause for the substitution of counsel:

> We conclude that the district court did not abuse its discretion by denying Woods's motions because he did not show good cause for substitution of counsel, and his requests were based on the subjective belief that he and his attorney had a breakdown in communication. *See Gallego v. State*, 117 Nev. 348, 363, 23 P.3d 227, 237 (2001) (recognizing that good cause to establish a substitution of counsel is not determined by the defendant's subjective perceptions), *abrogated on other grounds by Nunnery v. State*, 127 Nev. 749, 776 n.12, 263 P.3d 235, 253 n.12 (2011).[120]

Woods relies on the Ninth Circuit Court of Appeals case of *United States v. Moore*[121] to contend that he had an irreconcilable conflict with Murray that effectively denied him his right to counsel.[122] But even if the record supported the conclusion that there was an irreconcilable conflict between Woods and Murray,[123] Woods cites no clearly established Supreme Court precedent holding that an irreconcilable conflict can constitute a per se denial of a criminal defendant's right to counsel.[124] Nor does he cite any Supreme Court precedent setting forth a test to determine whether an irreconcilable conflict existed.

---

[119] ECF No. 33-18 at 44–56.

[120] ECF No. 34-2 at 5 n.2.

[121] *United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998).

[122] ECF No. 17 at 11–12; ECF No. 60 at 12, 15–17.

[123] As is discussed supra, I find that there was not an irreconcilable conflict rising to the level of a constitutional violation.

[124] *See Carter v. Davis*, 946 F.3d 489, 508 (9th Cir. 2019) (noting that the Supreme Court "has never held that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel"); *see also* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 365 (2000).

Woods cites the Supreme Court's findings in *Holloway v. Arkansas*,[125] *Wood v. Georgia*,[126] and *Wheat v. United States*,[127] for the proposition that "[a] court has the obligation to inquire into allegations of a conflict of interest that could violate the right to the effective assistance of counsel."[128] But those cases involved alleged actual conflicts of interest on the part of defense counsel, not alleged irreconcilable differences between attorney and client. Woods cites *Schell v. Witek*[129] for the same proposition,[130] but that is a Ninth Circuit Court of Appeals case, not a decision of the United States Supreme Court. Woods cites no United States Supreme Court precedent imposing a constitutional obligation on state trial courts to inquire into claims of irreconcilable attorney-client conflicts.[131] So I find that the Nevada Supreme Court's ruling was reasonable because Woods has not shown that it was based on an unreasonable determination of the facts in light of the evidence of that it was contrary to, or an unreasonable application of, United States Supreme Court precedent.

**E. Woods's voir dire claim does not entitle him to habeas relief.**

In ground three, Woods claims that the trial court violated his rights to self-representation and due process of law under the Sixth and Fourteenth Amendments by precluding him from personally questioning prospective jurors during jury voir dire.[132] Generally, the procedure by

---

[125] *Holloway v. Arkansas*, 435 U.S. 475, 484–85 (1978).

[126] *Wood v. Georgia*, 450 U.S. 261, 271–72 (1981).

[127] *Wheat v. United States*, 486 U.S. 153, 163–64 (1988).

[128] ECF No. 17 at 11.

[129] *Schell v. Witek*, 218 F.3d 10117 (9th Cir. 2000).

[130] ECF No. 17 at 18.

[131] In the alternative, I would find that the Nevada Supreme Court could reasonably have determined that the trial court's inquiry into the conflict between Woods and Murray was sufficient.

[132] ECF No. 17 at 18–30.

which jury voir dire is conducted is within the discretion of the trial court.[133] In this case, the trial judge advised the parties that he would question the prospective jurors, and he directed the parties to submit proposed questions.[134] Woods submitted proposed questions and the judge rejected some of them and modified others, finding them to be improper or irrelevant as proposed.[135] The judge asked the approved questions provided by Woods and the prosecution.[136] Woods contends that the trial court erred by restricting his ability to ask follow-up questions.

Woods asserted this claim on direct appeal.[137] The Nevada Supreme Court denied relief, finding that Woods failed to raise an objection on this basis at trial and applying plain-error review:

> Under plain-error review, the "appellant must demonstrate that: (1) there was an error; (2) the error is plain, meaning that it is clear under current law from a casual inspection of the record; and (3) the error affected the defendant's substantial rights." *Jeremias v. State*, 134 Nev. 46, 50, 412 P.3d 43, 48 (internal quotation marks omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 415 (2018). Woods has not shown that any of the alleged errors affected his substantial rights, so he fails to prove any plain error. Further, none of the alleged errors would have affected his substantial rights because, as we discussed, overwhelming evidence supported the verdict. *Green v. State*, 119 Nev. 542, 548, 80 P.3d 93, 97 (2003). Thus, we conclude that none warrant relief under the plain-error rule.[138]

---

[133] *Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *see also Skilling v. United States*, 561 U.S. 358, 386 (2010) (noting that jury selection is "particularly within the province of the trial judge" (quoting *Ristaino v. Ross*, 424 U.S. 589, 595 (1976)).

[134] ECF No. 32-2 at 15.

[135] *Id*. at 12–13; *see also* ECF No. 17 at 22–29 (Woods's allegations regarding the trial court modifying and rejecting certain of his proposed questions for prospective jurors).

[136] ECF No. 32-6 at 13 ("THE COURT: I'm asking all the questions . . . that are provided by both sides. Okay? THE DEFENDANT: All right.").

[137] ECF No. 33-18 at 26–44; *see also* ECF No. 17 at 18 (Woods's statement that "[t]his claim was exhausted on direct appeal to the Nevada Supreme Court").

[138] ECF No. 34-2 at 12 n.5. Respondents point to a different part of the Nevada Supreme Court's order—the discussion at ECF No. 34-2 at 2–4—as resolving this claim. ECF No. 57 at 17, 19.

Woods cites the United States Supreme Court case of *McKaskle v. Wiggins*[139] as requiring that a defendant representing himself at trial be allowed "to participate in voir dire."[140] But that statement is dicta and found in a list of rights that pro se defendants must be afforded: "The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial."[141] The defendant in *McKaskle* elected to have his standby counsel conduct voir dire, so the question presented here—whether a pro se defendant must be permitted to personally address prospective jurors—was not resolved in *McKaskle*. Woods thus has not shown that the trial judge's decision to conduct voir dire using questions submitted by Woods and the prosecution violated a clearly established federal law as determined by the Supreme Court.

Woods also cites *Ross v. Oklahoma* for the proposition that "due process requires [the] trial court to follow procedures codified in jury selection statutes," and he argues that the trial court did not follow Nevada Revised Statute (NRS) 175.031, which provides that the court must conduct the initial examination, "and the defendant or the defendant's attorney and the district attorney are entitled to supplement the examination by such further inquiry as the court deems proper." The rule states that "[a]ny supplemental examination must not be unreasonably

---

But that discussion concerned a separate claim that the trial court abused its discretion by modifying or rejecting three of his proposed questions. *See* ECF No. 34-2 at 2–4. Woods's claim in ground three is that his constitutional rights were violated by the trial court "denying his right to personally voir dire jurors during the canvass." ECF No. 17 at 18. That claim was denied by the Nevada Supreme Court in footnote 5 of its order.

[139] *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984).

[140] ECF No. 17 at 19.

[141] *McKaskle*, 465 U.S. at 174.

restricted."[142] But Woods has not shown that Nevada has interpreted NRS 175.031 to require that a defendant is entitled to ask further questions under the circumstances presented here. Construction of that statute is a matter of state law, on which the Nevada Supreme Court's ruling is authoritative and beyond the scope of this federal habeas review.[143]

Woods also argues that in not allowing him to question jurors directly, the trial court rendered the *Faretta* canvass invalid because "the court repeatedly assured Woods that if he chose to represent himself, he would have the right to personally question jurors, then later prevented him from doing so."[144] Woods overstates what Judge Herndon said about jury voir dire during the *Faretta* canvass.[145] The judge simply meant to describe jury voir dire in general terms and to warn Woods that it is a process better handled by an attorney. And a review of the record shows that the judge asked most, if not all, of the questions Woods proposed, even if they weren't in the form that Woods proposed. Woods also fails to demonstrate that the trial court violated established federal law by implying that a defendant would be able to ask questions directly, but then choosing instead to ask modified versions of the defendant's questions. So I find that the Nevada Supreme Court's ruling on Woods's third claim was not an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court, and that it was not based on an unreasonable determination of the facts in light of the evidence presented.

---

[142] Nev. Rev. Stat. § 175.031.

[143] *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[S]tate court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).

[144] ECF No. 17 at 19.

[145] *See* ECF No. 30-15 at 30–32.

**F. Woods's prosecutorial-misconduct claims do not entitle him to habeas relief.**

In ground four, Woods claims that his rights to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments were violated because the prosecution committed misconduct.[146] Woods assigns flaws to three actions: (1) the prosecution undermined the presumption of innocence by asserting Woods's guilt during opening statements, speaking about his arrest for this crime, and soliciting testimony about his prior prison stint; (2) the prosecution used leading questions throughout the testimony of "one of its key witnesses, Detective Buddy Embry"; and (3) the prosecution misled the jury by misstating the evidence while questioning witnesses and during its closing argument.[147]

Prosecutorial misconduct results in a constitutional violation warranting federal habeas corpus relief if the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[148] A defendant's constitutional right to due process of law is violated if the prosecutor's misconduct renders a trial "fundamentally unfair."[149] Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process."[150] If there is constitutional error,

---

[146] ECF No. 17 at 30–36.

[147] *Id*.

[148] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (cleaned up).

[149] *Id*. at 181–83; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

[150] *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation and internal quotation marks omitted); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Turner v. Calderon*, 281 F.3d 851, 868 (9th Cir. 2002).

courts apply harmless-error review to determine if the error "had substantial and injurious effect or influence in determining the jury's verdict."[151]

### *1. Woods's presumption-of-innocence and leading-questions arguments fail.*

Woods claims that during the initial phase of his bifurcated trial the prosecution undermined the constitutionally required presumption of his innocence by showing the jury a PowerPoint presentation with a slide that said "GUILTY" on it.[152] Woods also points out that the prosecution informed the jury that he had been arrested, handcuffed, and booked into the Clark County Detention Center.[153] And Woods takes issue with the prosecution's questioning of a witness who testified that Woods threatened to kill D.L. and Josie if he ever "went back to jail," which informed the jury that Woods had been previously incarcerated.[154] Woods further suggests the prosecution committed misconduct by using leading questions throughout the testimony of Detective Buddy Embrey.[155]

All of these arguments were asserted on direct appeal, and the Nevada Supreme Court denied relief based on plain-error review, finding that "none of the alleged errors would have affected [Woods's] substantial rights because . . . overwhelming evidence supported the verdict."[156] Applying the standard of review mandated by 28 U.S.C. § 2254(d), I find this ruling to be objectively reasonable. This alleged misconduct on the part of the prosecutors did not

---

[151] *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (cleaned up); *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012).

[152] ECF No. 17 at 30–32 (referring to ECF No. 20-1 (32nd slide) (filed under seal)).

[153] *Id*. at 31 (referring to ECF Nos. 32-11 at 33–34, 32-12 at 114–16, 32-13 at 35–36 and 48–49, 32-17 at 29–30, and 72).

[154] *Id*. at 31–32; *see* ECF No. 32-13 at 76 (witness testimony).

[155] ECF No. 17 at 32–33; *see* ECF No. 32-13 at 134–71 (Detective Embrey's testimony).

[156] ECF No. 34-2 at 12 n.5.

render Woods's trial fundamentally unfair. As discussed infra, the prosecution's conduct pales in light of the overwhelming evidence against Woods.

### *2. The prosecution's misleading statements were harmless.*

Woods's last claim in ground four is that the prosecution committed misconduct by misleading the jury with facts not in evidence.[157] Woods theorizes that in questioning Detective Embrey the prosecutor misstated the facts, suggesting that no one but Woods knew that Josie's assailant drove a Ford Taurus, when in fact two witnesses testified that they saw the assailant leave the scene in a Taurus. Woods also contends that the prosecution misstated witness testimony during closing argument about various comments Woods made to D.L. and Josie.[158] Woods asserted this claim on direct appeal.[159] The Nevada Supreme Court denied relief, finding that the prosecution committed misconduct but that the misconduct was harmless:

> We apply a two-step analysis to review prosecutorial misconduct claims. *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). "First, we must determine whether the prosecutor's conduct was improper. Second, if the conduct was improper, we must determine whether the improper conduct warrants reversal." *Id*. (footnote omitted). "With respect to the second step of this analysis, this court will not reverse a conviction based on prosecutorial misconduct if it was harmless error." *Id*. "It is improper for the State to refer to facts not in evidence." *Rose v. State*, 123 Nev. 194, 209, 163 P.3d 408, 418 (2007).
>
> Here, on cross-examination, the State asked a witness whether Woods was the only person who knew that Josie Jones's assailant drove a Ford Taurus, and the witness answered in the affirmative. Two previous witnesses, however, had testified that the assailant drove away from the murder scene in a Ford Taurus. Moreover, the State's closing argument misstated the precise testimony of

---

[157] ECF No. 17 at 33–36.

[158] *Id*.; *see* ECF Nos. 32-13 at 167 (prosecutor's questioning of Detective Embrey); 32-17 at 68–69 (prosecutor's argument about Woods telling D.L. he saw her through a window); 32-17 at 80 (prosecutor's argument about Josie telling witnesses Woods had threatened her).

[159] ECF No. 33-18 at 62–66.

> D.L. and D.L.'s friend about threats Woods made to Jones, and the State mischaracterized D.L.'s testimony about Woods observing D.L. from a bathroom window while she undressed. Thus, by mischaracterizing the testimony, the State relied upon facts not in evidence, which constitutes misconduct.
>
> "[T]his court will not reverse a conviction based on prosecutorial misconduct if it was harmless error." *Valdez*, 124 Nev. at 1188, 196 P.3d at 476. "If the error is not of constitutional dimension, we will reverse only if the error substantially affects the jury's verdict." *Id*. at 1189, 196 P.3d at 476. "The level of misconduct necessary to reverse a conviction depends upon how strong and convincing is the evidence of guilt. If the issue of guilt or innocence is close, if the [S]tate's case is not strong, prosecutor misconduct will probably be considered prejudicial." *Gaxiola v. State*, 121 Nev. 638, 654, 119 P.3d 1225, 1236 (2005).
>
> The evidence of Woods's guilt was overwhelming. Crucially, Woods made a phone call from jail stating that he "did something to [Jones], but I don't think she's gonna make it." The jury listened to the audio recording of this call, and had the opportunity to compare Woods's voice with the person who made the phone call. Moreover, the phone number Woods dialed from jail was a contact in his cell phone. Three eyewitnesses identified Woods as the perpetrator of Jones's murder, including D.L., who exclaimed during and after Jones's stabbing that Woods was the perpetrator. Two police officers testified that Woods approached them and admitted involvement with an incident at the same location where Jones was murdered. Thus, we conclude that the overwhelming strength of this evidence renders any prosecutorial misconduct harmless.[160]

Applying the deferential standard of review prescribed by 28 U.S.C. § 2254(d), I find that the Nevada Supreme Court's ruling was reasonable. The Court's conclusion that the "evidence of Woods's guilt was overwhelming" was not an unreasonable determination of the facts in light of the evidence. The prosecution's misstatements did not concern the credibility of this additional evidence of Woods's guilt. I thus find that Woods is not entitled to relief on ground four.

---

[160] ECF No. 34-2 at 5–7.

**G. Woods's claim that the jury was not instructed on an essential element of his weapons charge does not entitle him to habeas relief.**

In ground six, Woods claims that his right to a fair trial under the Sixth and Fourteenth Amendments was violated because the trial court failed to instruct the jury on an essential element of the weapons charges.[161] Woods was convicted of two counts of ownership or possession of a firearm by an ex-felon, a violation of NRS 202.360.[162] He contends that the court failed to instruct the jury that the State was required to prove beyond a reasonable doubt that he knew he belonged to the relevant category of persons barred from possessing firearms.[163] Woods cites *Rehaif v. United States*[164] as establishing that such knowledge is an essential element of the offense.[165]

Woods asserted this claim on his direct appeal,[166] and the Nevada Supreme denied relief, explaining that while knowledge of felon status is essential to a federal weapons charge under 18 U.S.C. § 922(g) and U.S.C. § 924(a)(2), the Nevada Supreme Court never held that knowledge is an essential element of proving a charge under NRS 202.360:

> Woods argues that the district court failed to instruct the jury on an essential element of possession of a firearm by a prohibited person under NRS 202.360. He contends that the United States Supreme Court has held that, to secure a conviction for possession of a firearm by an ex-felon, the prosecution "must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif v. United States*, [588 U.S. 225, 237], 139 S. Ct. 2191, 2200 (2019). Woods contends that we

[161] ECF No. 17 at 39–40; *Hurst v. Florida*, 577 U.S. 92, 97 (2016).

[162] ECF No. 33-1.

[163] ECF No. 17 at 40.

[164] *Rehaif v. United States*, 588 U.S. 225 (2019).

[165] ECF No. 17 at 40.

[166] ECF No. 33-18 at 74–76.

> adopted all the elements of illegal firearm possession as articulated by *Rehaif* in *Hager v. State*, 135 Nev. 246, 447 P.3d 1063 (2019), and that the district court did not instruct the jury on whether Woods knew he belonged to the class of persons barred from possessing a firearm.
>
> "[W]e review de novo whether a particular [jury] instruction . . . comprises a correct statement of the law." *Cortinas u. State*, 124 Nev. 1013, 1019, 195 P.3d 315, 319 (2008).
>
> In *Rehaif*, the Supreme Court concluded that a conviction for illegal firearm possession under 18 U.S.C.A. § 922(g) (West 2015) and U.S.C.A. § 924(a)(2) (West 2018) required the prosecution to prove that the defendant knew he possessed a firearm and that he knew he was barred from possessing a firearm." [588 U.S. at 237], 139 S. Ct. at 2200. In *Hager*, we explained the following with respect to Nevada's felon-in-possession statute:
>
> *Similar to its federal counterpart*, illegal firearm possession under NRS 202.360 has three main elements: (1) a status element (the defendant falls within one of the categories of person the statute prohibits from possessing a firearm); (2) a possession element ("[a] person shall not . . . have in his or her possession"); and (3) a firearms element ("any firearm"). 135 Nev. at 249, 447 P.3d at 1066 (emphasis added).
>
> The district court did not err by not instructing the jury that Woods had to know that he belonged to the relevant category of persons barred from possessing a firearm. *Hager* did not interpret NRS 202.360 as requiring the State to prove an element of knowledge. *Id*. Further, unlike the federal statute, NRS 202.360 does not require the State to prove the defendant "knowingly" possessed a firearm during sentencing. *Compare* 18 U.S.C.A. § 924(a)(2) (West 2018), *with* NRS 202.360(1). Based on the record, we conclude that the district court properly instructed the jury on the elements of NRS 202.360(1).[167]

Woods's claim fails for a fundamental reason: the definition of state criminal offenses is a matter of state law.[168] The court is bound here by the Nevada Supreme Court's determination

---

[167] ECF No. 34-2 at 10–12.

[168] *Johnson v. United States*, 559 U.S. 133, 138 (2010); *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979).

of the elements of NRS 202.360.[169] Woods does not show the Nevada Supreme Court's ruling to be an unreasonable application of *Rehaif* or any other United States Supreme Court precedent. So, applying the standard of review required by 28 U.S.C. § 2254(d), I deny Woods relief on ground six.

**H. Woods's cumulative-error claim fails.**

Woods contends in ground seven that the cumulative effect of the errors he alleges violated his federal constitutional rights.[170] Cumulative error may supply a basis for habeas relief if, "although no single trial error examined in insolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."[171] The only potential trial error I have identified is the prosecutorial misconduct alleged in ground four. I find that, whether considered individually or cumulatively, the instances of prosecutorial misconduct alleged in that claim did not render Woods's trial fundamentally unfair and did not violate his federal constitutional rights. I thus deny Woods relief on ground seven.

**I. Certificate of appealability**

The right to appeal from a district court's denial of a federal habeas petition requires a certificate of appealability. To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[172] If the "district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

[169] *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67–68 (1991).

[170] ECF No. 17 at 41.

[171] *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

[172] 28 U.S.C. § 2253(c).

claims debatable or wrong."[173] I decline to issue a certificate of appealability because this standard is not met here.

## Conclusion

IT IS THEREFORE ORDERED that Woods's amended petition for writ of habeas corpus **[ECF No. 17] is DENIED**, and a certificate of appealability is **DENIED**.

**The Clerk of Court is directed to:**

- **SUBSTITUTE** Debora Borgas for respondent Terry Royal, and
- **ENTER JUDGMENT** for the respondents and **CLOSE THIS CASE**.

U.S. District Judge Jennifer A. Dorsey
August 25, 2026

[173] *Slack*, 529 U.S. at 484; *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9h Cir. 2000).